**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 26-CR-121 (DLF)** |
| **MICHAEL MARX (AKA: Patrick Gary** | : | |
| **Michael or Michael Zavici),** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR**
**IMMEDIATE RELEASE FROM CUSTODY AND FOR EMERGENCY HEARING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully requests the Court deny Defendant's Emergency Motion for Immediate Release from Custody and for Emergency Hearing (the "Motion"). *See* (ECF No. 15).

Defendant should be detained pending trial because he: (i) is a severe danger to the community; and (ii) poses a serious risk of flight.[1] Defendant's offense conduct demonstrates a complete disregard for human life, including a willingness to employ extreme violence without regard for the safety of others or his own well-being. Moreover, Defendant has no meaningful connections to the District of Columbia; uses multiple aliases; and he has history of possessing several identification cards in different names. These facts, coupled with his prior crimes of dishonesty and the prospect of significant jail time, establish by a preponderance of evidence that he poses a serious risk of flight and by clear and convincing evidence that he presents a danger to the community. In addition, because Defendant is charged with violation of 18 U.S.C. § 924(c),

---

[1] Defendant is eligible for pretrial detention because this case involves: (i) a crime of violence (18 U.S.C. § 111(a)(1), (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon); and (ii) an offense for which the maximum sentence is life imprisonment (18 U.S.C. § 924(c)(1)(A)(iii) (Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During a Crime of Violence). *See* 18 U.S.C. § 3142(f)(1)(A)-(B).

he is subject to the rebuttable presumption that no condition or combination of conditions will reasonably assure his appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(B). Although the presumption is rebuttable, it remains a factor weighing in favor of detention, and Defendant cannot overcome it here.

## I.    FACTUAL BACKGROUND

On May 4, 2026, at approximately 3:33 p.m., a USSS officer (hereinafter, "Investigator-1") was working in plain clothes in the area of 15th Street and Constitution Avenue, Washington, D.C. Investigator-1 advised that they observed a white male wearing a grey shirt and black pants (the "Suspect") appearing to conceal a firearm on the right side of the person's body. Investigator-1 requested a response from uniformed USSS police. In parallel to these actions, at approximately 3:38 p.m., the motorcade for the Vice President of the United States of America ("VPOTUS"), J.D. Vance, was departing the White House nearby.

Uniformed USSS officers observed Defendant, who matched the description of the Suspect, walking south on 15th Street Southwest towards Independence Avenue Southwest, Washington, D.C.[2] The officers, who were traveling in marked USSS vehicles, attempted to speak with Defendant while he was walking. According to multiple civilians who were standing nearby, Defendant told the law enforcement personnel to stop harassing him and to leave him alone. Defendant then walked to the corner of 15th Street Southwest and Independence Avenue Southwest, and used a family of bystanders as a shield between himself and the USSS officers.

---

[2] It should be noted that when officers first arrived, the Suspect was walking along the path of VPOTUS' motorcade.



*Figure 1: Defendant (highlighted in yellow) standing behind bystanders walking in the area*

At this point, the civilians crossed the intersection headed east, and the USSS officers tried to stop Defendant again. However, Defendant continued to disregard law enforcement's commands and began to cross the intersection himself, picking up his pace as he traveled.



*Figure 2: Defendant (highlighted in yellow) crossing the street while USSS officers attempt to speak with him*

As Defendant crossed the street, he reached to the right side of his waistband, produced a firearm, and pointed it in the direction of USSS Officer D.P. At this time, a civilian, V-1, happened to be standing directly being the officer.



*Figure 3: Defendant (highlighted in yellow) reaching towards the right side of his waistband as he runs towards the civilians standing nearby*



*Figure 4: Defendant (highlighted in yellow) pointing his firearm towards USSS Officer D.P. and V-1*



*Figure 5: Defendant (highlighted in red) with his arms outstretched in a shooting position*

Defendant then fired at least one round towards the officer, which ultimately struck V-1 in both feet.





*Figure 6: V-1's shoe and foot injuries*

V-1 appeared to begin clutching his leg right after Defendant fired his weapon. V-1's family who was present with him, reported that V-1 had been shot in the leg/foot. V-1 was transported to Howard University Hospital for evaluation.



*Figure 7: V-1 clutching at his leg/foot after Defendant shot him*

Officers returned fire towards Defendant, striking him in the hand, left arm, and upper abdomen. As Defendant fell to the ground after being shot, the firearm flew from his hand onto the nearby sidewalk area.



*Figure 8: the firearm (highlighted in red) flying from Defendant's hand (highlighted in yellow)*

Defendant then collapsed on the east side of the intersection of 15th Street SW and Independence Avenue SW. Officers placed Defendant in handcuffs and then immediately tended to his injuries. At this time, Defendant tried to pull his arms away from the officers, told the officers they "fucking paralyzed" him and to kill him, and spat at them.

Law enforcement observed several pieces of property near and on Defendant's person. This included, among other things: (i) a Texas ID in Defendant's name; (ii) one (1) Sig Sauer P365 semi-automatic pistol containing one (1) Blazer 9mm Luger cartridge in the chamber and ten (10) 9mm cartridges in the magazine; (iii) one (1) empty Blazer 9mm Luger cartridge case; (iv) seven (7) empty Speer 9mm Luger +P cartridge cases; and (v) a set of Chrysler keys. Law enforcement also found one additional magazine found in Defendant's front right pant pocket with twelve (12) additional 9mm cartridges.



*Figure 9: Sig Sauer P365 semi-automatic pistol found near Defendant's person*

Officers then transferred Defendant into an ambulance to be transported to George Washington University Hospital. While in custody, Defendant stated: (i) "I fucking hate cops;" (ii) that he was allergic to cops; and (iii) "Kill me, Kill me." When Defendant got to the hospital, he also stated, "Fuck the White House," and reiterated that he wanted to die.

Based on law enforcement's investigation of this matter, it was revealed that Defendant circled around the White House Complex in the hour leading up to the charged offenses. As set forth below, Defendant approached several law enforcement members at various White House Complex posts. About 20 minutes before the charged crimes, he also approached unknown individuals who were waiting in line to enter the White House Complex and appeared to try to speak to them. Below is a timeline of Defendant's relevant movements shortly before he shot at USSS Officer D.P., striking V-1.

1. 15th St and Constitution Avenue NW: Defendant talks to a patrol unit from 3:02:32 p.m. – 3:02:44 p.m. (Figures 10-11 below).



*Figure 10*



*Figure 11*



*Figure 12: Approximate location shown in red bubble in map*

2.  17th St and Pennsylvania Ave entry bollards: Defendant walks past signage and talks to a foot patrol officer from 3:16:16 p.m. – 3:17:38 p.m. (Figure 13 below).



*Figure 13*



*Figure 14: Approximate location shown in red bubble in map*

3.  17th Street NW and State Place NW vehicle post: Defendant talks to individuals waiting in line to enter the White House Complex at 3:19:55 p.m. – 3:20:40 p.m. (Figures 15-16 below).



*Figures 15-16*



*Figure 17: Approximate location shown in red bubble in map*

4. 17th St and Constitution Ave NW: Defendant talks to National Guard units at 3:27:16 p.m. – 3:27:33 p.m. (Figure 18 below).



*Figure 18*



*Figure 19: Approximate location shown in red bubble in map*

After Defendant's arrest, USSS personnel canvassed the area and located a 2002 blue Chrysler PT Cruiser bearing VIN # 3C8FY58B32T275954[3], parked in a lot near the Tidal Basin, adjacent to Independence Avenue Southwest/Main Avenue Southwest. On May 5, 2026, law enforcement searched the vehicle pursuant to a warrant authorized by United States Magistrate Zia M. Faruqui. Inside of the vehicle law enforcement found clothing items and what appeared to be a blanket. The officers also found a faraday bag containing foreign currency from several different countries, including but not limited to the United Arab Emirates, Ukraine, Georgia, China, and Poland.

---

[3] The Chrysler PT Cruiser's license plate and vehicle registration were associated with Defendant.



***Figure 20: foreign currency found in Defendant's vehicle***

Law enforcement also recovered, among other things: (i) a Sig Sauer P365 grip module; (ii) steel optics mounting plates; (iii) polymer grip backstraps for pistols; (iv) a vast quantity of ammunition (some that appeared to be stored inside of a sock); and (v) a magazine loaded with 9mm ammunition. Some of the ammunition found within the vehicle was Blazer 9mm, i.e., the same type of ammunition that was in the chamber of the Sig Sauer P365 found at the crime scene.



*Figure 21: Sig Sauer P365 grip found in Defendant's vehicle*



*Figure 22: Ammunition, steel optics mounting plates and backstraps for pistols found in Defendant's vehicle*



*Figure 23: Sock with ammunition found in Defendant's vehicle*

Finally, officers also recovered identification documents—a passport, driver's license from multiple states, and a social security card—in Defendant's name and under various aliases, including "Michael Patrick Gary" and "Michael Zavici."

On May 6, 2026, law enforcement test fired the Sig Sauer P365 pistol found near Defendant's person, and the test fired casing was entered into the National Integrated Ballistic Information Network ("NIBIN"). This process revealed a presumptive lead between the test fired casing and the empty Blazer 9mm casing found at the crime scene, i.e., a preliminary finding that the Sig Sauer P365 pistol fired the empty Blazer 9mm Luger casing.

## II.    PROCEDURAL HISTORY

On May 6, 2026, United States Magistrate Zia M. Faruqui approved a criminal complaint against Defendant for the conduct described above. (ECF No. 1). The complaint charged Defendant with violations of: (i) 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, Impeding

16

Certain Officers Using a Dangerous Weapon); (ii) 18 U.S.C. § 924(c)(1)(A)(iii) (Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During a Crime of Violence); and (iii) 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year).

On May 28, 2026, a grand jury returned a two-count indictment against Defendant, charging him with violations of: (i) 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, Impeding Certain Officers Using a Dangerous Weapon); and (ii) 18 U.S.C. § 924(c)(1)(A)(iii) (Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During a Crime of Violence). (ECF No. 5).

On June 3, 2026, Defendant filed the Motion. (ECF No. 15). In the Motion, Defendant requests he be released to an acute care impatient rehabilitation facility. *Id*. at 5. Defendant argues that he is not a fight risk or danger to the community given: (i) his minimal criminal history; and (ii) the injuries he sustained during the charged offenses. *Id*. at 6-11. Defendant also requests a hearing on the Motion if necessary. *Id.* at 5.

### III.   <u>ARGUMENT</u>

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

In determining whether any condition or combinations of conditions will reasonably assure the appearance of a defendant and the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) his history and characteristics;

and (iv) the nature and seriousness of the danger to any person or the community that would be posed by his release. 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the United States may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the United States is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

A review and understanding of the facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would ensure Defendant's appearance and the safety of the community should he be released. *See* PSR at 1. Accordingly, the Court should detain Defendant pending trial.

## I.    The Nature and Circumstances of the Offense Support Detention.

The first factor to be considered is the nature and circumstances of the offense charged, which strongly weighs in favor of Defendant's detention.

Shortly before Defendant shot at USSS Officer D.P., Defendant circled around the White House Complex. While law enforcement did not definitively observe Defendant with a firearm at

this time, the Court can infer that Defendant was in possession of a loaded pistol[4], thereby exposing countless tourists and civilians to a potentially dangerous situation.

Once law enforcement made contact with Defendant, they calmy tried to speak with him. The officers were not displaying their weapons and did not use any force or violence at this time. Nevertheless, Defendant ignored their lawful directives and intentionally embedded himself with a nearby group of tourists who were standing in the area. Based on a review of the surveillance video, Defendant was clearly using innocent civilians—including juveniles—as a shield, placing them directly between himself and the approaching officers. This shows a callous disregard for the safety of those people, the countless other bystanders who were traveling in this extremely busy area, and the law enforcement personnel who were trying to perform their duties.

When the tourists tried to cross the street and get away from Defendant, he followed them and continued to disregard the USSS officers. Then, without provocation, Defendant reached into his waistband, pulled out a loaded firearm, and shot in the direction of USSS Officer D.P., striking V-1 who was standing nearby. At the time of the shooting—broad daylight on a weekday in a heavily populated area—there was at least seven civilians in his general line of sight, along with numerous law enforcement personnel. There were also several vehicles traveling behind him, thereby exposing those cars, and the occupants inside, to the officers' responsive gunfire.[5]

Defendant's behavior after he was shot shows that he has no remorse for his actions, and that he will continue to be aggressive and violent going forward. Despite being struck

---

[4] Law enforcement only observed the outline of what they believed to be a firearm on Defendant's person.

[5] Based on the evidence to date, it appears that one of these vehicles did in fact get struck by a bullet from one of the USSS officers who shot at Defendant. None of the occupants were injured, but this demonstrates that Defendant's criminal conduct put everyone in the area at risk.

approximately three times, Defendant: (i) tried to pull his arms away from law enforcement as they attempted to handcuff him; (ii) spat at the officers; and (iii) told them to kill him. While in custody, Defendant stated, "I fucking hate cops," and that he was allergic to cops. And when he got to the hospital for treatment, he stated, "Fuck the White House," and repeated his pleas to be killed. Defendant was presumably in immense pain during this portion of the event. But that did not stop him from disparaging and defying law enforcement and speaking in a threatening manner.

After the shooting occurred, law enforcement only found more evidence of a concerning nature. In particular, upon searching his vehicle, the officers found, among other things: (i) a Sig Sauer P365 grip module; (ii) steel optics mounting plates; (iii) polymer grip backstraps for pistols; (iv) a vast quantity of ammunition (some that appeared to be stored inside of a sock); and (v) a magazine loaded with 9mm ammunition. The officers also recovered identification documents—a passport, driver's license from multiple states, and a social security card—in Defendant's name and under various aliases, including "Michael Patrick Gary" and "Michael Zavici."

Overall, Defendant engaged in a heinous crime that could have resulted in people being seriously hurt or even killed. He placed his own interests over everyone in the community and showed zero remorse for his actions. Accordingly, this factor weighs in favor of detention.

## II.    The Weight of the Evidence Against the Defendant is Formidable.

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[6] The United States's case against Defendant is overwhelming. Defendant's offenses

---

[6] This factor should be equally weighed. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25, 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is

were captured on video surveillance from multiple vantage points. Numerous witnesses stated that they saw Defendant with a firearm shortly before the shooting. Additional rounds of ammunition—of the same caliber and make as the one fired from Defendant's firearm—were found in Defendant's vehicle. And the forensic evidence, including the NIBIN lead, corroborates the United States's theory of the case: that Defendant fired his Sig Sauer P365 semi-automatic pistol towards USSS Officer D.P., ultimately striking V-1.

Accordingly, the strength of the evidence weighs decisively in favor of detention.

## III.     The Defendant's History and Characteristics Merit Detention.

The third factor—the defendant's history and characteristics—also weighs in favor of detention.

First, this is not Defendant's first encounter with the criminal justice system. Rather, Defendant has several prior convictions:

- On March 30, 2005, Defendant was sentenced to 9 months of probation for Fraudulent Checks (docket unavailable);

- On April 14, 2005, Defendant was sentenced to 100 hours of community service for Larceny over $500 (docket unavailable);

- On April 19, 2011, Defendant was sentenced to 2 years of probation for Drug Trafficking (docket unavailable); and

- On March 6, 2012, Defendant was sentenced to, among other things, 12 months of probation for Driving Under the Influence and Driving with a Suspended License (docket unavailable).[7]

---

appropriate." *Id.* at \*10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). The Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

[7] Defendant also has two other convictions for driving with a suspended license.

Second, the offense conduct demonstrates that he remains an extraordinary danger to the community. Defendant's current physical condition does not alter that conclusion. Although the Motion discusses the injuries Defendant sustained after being shot and his present medical status, there is no indication that the charged incident affected his cognitive functioning or diminished his propensity for violence. Someone willing to fire a gun at law enforcement in the manner that he did is not going to suddenly become a peaceful person because he is partially immobilized. Indeed, Defendant's conduct after the shooting underscores the point: even after being struck, he continued to act aggressively, refused to comply with law enforcement commands, and asked officers to kill him repeatedly. If released, Defendant will have better access to a firearm—or any other type of weapon—and, given his current medical state, he still can use such an item. Pretrial detention remains the only means of reasonably protecting the community from these risks. *See United States v. Albertson*, No. 06-CR-177, 2006 WL 8426738, at *2 (M.D. Pa. Aug. 8, 2006) (noting that it would be "judicially irresponsible" to release the defendant prior to trial after considering, among other things, the defendant's past suicide attempts).

Third, Defendant presents a substantial risk of flight and cannot be trusted to comply with court-imposed conditions. As noted above, Defendant's vehicle contained numerous forms of identification using aliases such as "Michael Patrick Gary" and "Michael Zavici." Law enforcement also found a passport and foreign currency from various countries. Defendant has no meaningful ties to the District of Columbia, and his history of using aliases and false identification demonstrates both a willingness and ability to evade law enforcement and conceal his identity. Coupled with the significant sentence he faces if convicted, these facts establish that no set of release conditions can reasonably assure his appearance.

Finally, Congress has already determined that defendants charged with offenses like Defendant's should be detained pending trial. Because Defendant has been indicted on a violation of 18 U.S.C. § 924(c), he is subject to the rebuttable presumption that no condition or combination of conditions will reasonably assure either his appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(B). Although the presumption is rebuttable, Defendant has failed to present evidence sufficient to overcome it. And even if he had met his limited burden of production, the presumption remains a factor weighing heavily in favor of detention. *See United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011) ("Even with the defendant's evidence and proffers, [the § 3142(e)(3)] presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight.") (citation omitted).

Here, the presumption is reinforced—not rebutted—by the facts of this case: Defendant used extreme violence against law enforcement; he continued his aggressive conduct after being shot; he disregarded USSS officers' lawful directives on the offense date; he has prior convictions for Fraudulent Checks and Larceny; he possesses multiple aliases and identification documents; he lacks meaningful ties to the District;  and he faces a lengthy term of imprisonment if convicted. Defendant can continue this behavioral trend even while he lacks full mobility. Taken together, these circumstances confirm that no condition or combination of conditions can reasonably assure Defendant's appearance or the safety of the community.

For all these reasons, including the unrebutted statutory presumption of detention, this factor supports Defendant's pretrial detention.

IV.    <u>**The Defendant Presents a Danger to Our Community.**</u>

The fourth and final factor—the danger that the defendant poses to any person, the community, or the administration of justice—also weighs heavily in favor of detention. Defendant's conduct reveals that he is an extremely violent and dangerous individual that completely disregards the rule of the law.

As evidenced by his offense conduct, Defendant was willing to harm others to the greatest extent possible. At point blank range, Defendant fired his pistol at uniformed members of law enforcement in one of the busiest areas in the country. He did not care about their safety, and he consciously disregarded all the innocent bystanders who were walking and driving in the area. Thankfully, V-1 sustained minor injuries, and the occupants who were traveling in their vehicle nearby did not get harmed. But someone could have easily been severely injured or killed due to Defendant's actions. Although Defendant has specific medical concerns of his own, he can still use a firearm or other weapon in his current condition. In other words, he is still capable of hurting other people, and his history shows that he has desired such an outcome before.

The best way to guard against Defendant's future risk of danger is by detaining him in a guarded facility with trained law enforcement personnel. The United States anticipates having a witness from the United States Marshal Service at the upcoming hearing to address, among other things: (i) what facilities are available to house Defendant; (ii) what medical services are offered at the respective facilities; and (iii) where those facilities are located. While Defendant should certainly receive the appropriate level of care for his injuries, the Court must still consider and balance the safety of the community going forward.

Therefore, this factor weighs heavily in favor of detention.

24

## V.    CONCLUSION

There is no condition or combination of conditions that would ensure Defendant's compliance with court-ordered release conditions. Defendant poses a: (i) danger to others and the community at large; and (ii) risk of flight. For all the foregoing reasons, the United States respectfully requests the Court detain this defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO

UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:    */s/ Joshua Satter*
Joshua Satter
Assistant United States Attorney
NY Bar No. 5477112
601 D Street NW
Washington, DC 20579
(202) 252-7566
Josh.Satter@usdoj.gov